UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MASHAMA HILL,

                                                                Plaintiff,

     vs.                                                               9:11-CV-392
                                                                             (GTS/ATB)
JOSEPH BELLINIER, *et al.*,

                                                           Defendants.
_____

MASHAMA HILL, Plaintiff *pro se*
ROGER W. KINSEY, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants failed to protect him from another inmate and one of the officers used excessive force against plaintiff while he was being "extracted" from his cell. (Compl. Dkt. No. 1). Although plaintiff does not seek a specific amount of damages, he states that he seeks compensatory and punitive damages against defendants.[1]

Presently before the court is defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 10). Plaintiff has responded in opposition to the motion. (Dkt. No. 18). For the following reasons, this court will recommend dismissal of all

---

[1] In three places, the complaint states that plaintiff requests "the amount of $ - - - in compensatory damages & $ - - - in punitive damages . . . ." (Compl. "Relief Requested" ¶¶ 1-3).

the "official capacity" claims against all defendants.  The court will also recommend dismissal without prejudice of all but the excessive force against defendant Patterson in his individual capacity.

## DISCUSSION

**I.     Facts**

Plaintiff alleges that between November of 2007 and April of 2008, while he was incarcerated at Upstate Correctional Facility ("Upstate"), he wrote "a score of grievance complaints" about officer harassment and plaintiff's concerns about being "double-celled." (Compl. ¶ 1).  Plaintiff states that he complained about defendant Michelle McDonald, who was allegedly "informing the housing block inmates . . . of the nature of plaintiff's conviction."[2] *Id.*  Plaintiff claims that during this time, he also wrote to defendant Superintendent Bellinier, informing him about plaintiff's concerns about being housed with another inmate. (*Id.* ¶ 2).

As a basis for his "concern," plaintiff states that he was threatened with the "use of violence in 2002" at Elmira Correctional Facility by members of the "Blood Gang." Plaintiff states that, as a result of the 2002 threat, he was placed in Involuntary Protective Custody at Elmira. (*Id.*)  Plaintiff states that he mentioned the 2002 threat in his 2007-08 complaints "for the purpose of making clear that he was afraid for his safety and that his well-being was in jeopardy under double celling status . . . ." (*Id.*) Plaintiff also alleges that, during the same time (2007-08), he wrote formal complaints

---

[2] Plaintiff never mentions what the "nature" of his conviction is or why revealing it would cause a problem for plaintiff with "gang" members.

and grievances to defendant Bellinier, informing him about plaintiff's concern about being housed with inmates who were too young[3] and inmates who were incarcerated for much longer sentences than plaintiff's sentence.[4] (Compl. ¶¶ 3-4).

Plaintiff states that on April 10, 2008, he "aggressively implored the housing unit officers to remove [plaintiff] from the double cell in which he was [incarcerated] due to statements addressed to him by his cell mate Curtis Brown (a listed Blood Gang Member)." (Compl. ¶ 5). Plaintiff alleges that these "comments" concerned the "nature" of plaintiff's case. (*Id.*) Due to these comments, plaintiff became "fearful for his well-being," and he claims that he spoke to defendants McDonald and Patterson about being moved out of his cell. (*Id.*) Plaintiff's request was denied, and he claims that he was not allowed to speak to a superior officer, and his concerns were "further disregarded." Plaintiff states that as a result, he "refused to comply with the Officers' request to return his "feed up tray." (*Id.*)

Plaintiff alleges that later, he and his cell-mate "engaged in a physical conflict where plaintiff had overtaken his cell-mate and bound him up with torn bed linen to prevent him from perpetuating any further physical aggression." (Compl. ¶ 6). Plaintiff states that after he tied up his cell-mate, he was able to speak with officers, including superior officers, but they were more interested in plaintiff returning his tray

---

[3] Plaintiff states that he was housed with inmates who were 19, while plaintiff was 32. (Compl. ¶ 3). Plaintiff does not specify any particular dates that he was incarcerated with someone who was too young according to the Department's regulations. (*Id.*) Plaintiff also does not state any claim as a result of being housed with a "young" cell-mate.

[4] Plaintiff states no claim or injury from being housed with an inmate who had a proportionately longer sentence than plaintiff's sentence.

than in moving plaintiff to another cell. (Compl. ¶ 7). Plaintiff states that "an extraction team was assembled,"[5] and while carrying out the "extraction," defendant Patterson allegedly hit plaintiff on the head multiple times and pulled a patch of hair out of his head, even though plaintiff had already been restrained and was being cooperative. (*Id.* ¶¶ 7-8).

After plaintiff was removed from his cell, he was seen by medical personnel and then placed in a cell by himself for approximately three days, during which time, plaintiff alleges that he saw a sergeant, defendant McDonald, and another officer "attempting" to steal plaintiff's mail from the housing building mailbox.[6] (*Id.* ¶ 9). Plaintiff states that upon his release from the single cell, he was returned to a double cell, with a different cell-mate. Plaintiff alleges that he wrote a letter to the Inspector General, and that he was transferred to Clinton Correctional Facility as a result. (Compl. ¶ 10).

The complaint contains three paragraphs in a section entitled "Cause of Action." (Compl., Cause of Action (COA) ¶¶ 1-3). Plaintiff alleges that all defendants are being sued in their "official" and "individual" capacities for Eighth and Fourteenth Amendment violations. (*Id.*) He also states that he has named Superintendent Bellinier because he "intentionally failed" to act upon plaintiff's

---

[5] The court assumes that the "extraction team" was assembled because plaintiff would not return the tray and would not come out of the cell. Plaintiff was apparently threatening to use the tray on his cell-mate. (*See* Compl., Relief Requested ¶ 1). In the relief paragraph plaintiff states that he was holding the feed up tray and "conflicting his cellmate [sic]." Plaintiff admits in that paragraph that his actions might have "appear[ed] rather suspect." (*Id.*)

[6] Plaintiff does not make a claim relating to his mail.

4

complaints that he was being harassed by officers; double celled with inmates contrary to "policy," and that plaintiff was subject to being "victimized" by Blood Gang members. (COA ¶ 1). Plaintiff has sued defendant McDonald because she "intentionally exposed the nature of plaintiff's criminal conviction" to the inmates on the housing unit "for the purpose of causing plaintiff to feel threatened and to become harmed either immediately by his cell-mate or in the future by whomever [sic] possesses said information." (COA ¶ 2). Finally, plaintiff has named defendant Patterson because he "deliberately and needlessly afflicted blows upon plaintiff's head and tore hair from plaintiff's head, causing him much pain and to have to shave off the remainder of his hair due to spotting and large patching." (COA ¶ 3).

## II.     Motion to Dismiss

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations

omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir. 1995).  The court must heed its particular obligation to treat *pro se* pleadings with liberality.  *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference.  *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### III.   Statute of Limitations

#### A.   Legal Standard

The statute of limitations for section 1983 actions is the "general" statute for personal injury actions in the state in which the cause of action arose. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989).  In New York, it is well settled that the applicable statute of limitations is three years under N.Y. C.P.L.R. § 214(5). *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).  The statute of limitations begins to run on the date that plaintiff's claim accrued, which is the date that plaintiff has a complete and present cause of action and can file suit and obtain relief. *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

6

Defendants argue that the only specific date plaintiff includes in his complaint is April 10, 2008 (the day that he allegedly had the altercation with his cell-mate), and that his complaint was filed on April 11, 2011, one day after the statute of limitations ran. Plaintiff also includes general statements that he wrote "formal complaints and grievances" to defendant Bellinier between November 2007 and April 2008 and that he was threatened at Elmira in 2002.

### A. The "Prison Mailbox Rule"

The actual filing date of this action was April 11, 2011, one day beyond the three year statute of limitations applicable to the events of April 10, 2008. (Dkt. No. 1). However, the Supreme Court has held that an inmate's papers may be deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court. *Houston v. Lack*, 487 U.S. 266 (1988). The inmate in *Houston* was attempting to file a notice of appeal. *Id.* This rule became known as the "prison mailbox rule," and has been applied to inmates filing complaints for purposes of the statute of limitations. *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), *modified on other grounds*, 25 F.3d 81 (2d Cir. 1994). The Second Circuit has also held that when the delay is not attributable to mail in the prison system or to prison officials, the "prison mailbox rule" does not apply. *Walker v. Jastremski*, 430 F.3d 560, 561-64 (2d Cir. 2005).

#### 1.   Application

Although it is true that the complaint was not filed until April 11, 2011, (Dkt. No. 1), plaintiff signed the complaint on April 6, 2011, and the docket sheet indicates

that the complaint was postmarked April 7, 2011. (*Id.*) Plaintiff did not delay in giving his complaint to prison officials for mailing, and there is no reason not to apply the prison mailbox rule, making plaintiff's complaint "deemed filed" at the latest on April 7, 2011, prior to the expiration of the statute of limitations. Thus, this court will not base its recommendation of dismissal on the expiration of the statute of limitations.[7]

## IV. Eleventh Amendment

The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87 & n.1 (2d Cir. 1991) (citations omitted).

Plaintiff states that he is suing defendants in their individual and official capacities. To the extent that plaintiff is attempting to sue defendants for damages in their official capacities or to the extent that his complaint can be interpreted as raising such official capacity claims, he is barred by the Eleventh Amendment from doing so.

---

[7] Challenges to actions by defendants that occurred prior to April 7, 2008 may be barred by the statute of limitations, after considering whether equitable tolling would apply. However, other than mentioning that he wrote "grievances" and complaints between November of 2007 and April of 2008 and was threatened in 2002 by another inmate, plaintiff does not allege that defendants took any action on any specific date prior to April 10, 2008. Thus, the court will not considered whether equitable tolling would apply to conduct occurred prior to April 10, 2008.

All such claims may be dismissed with prejudice.

## V.     Personal Involvement

### A.     Legal Standard

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, 556 U.S. 662 (2009).

The failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement. *Smart v. Goord*, 441 F.

Supp. 2d 631, 642–643 (S.D.N.Y. 2006). Mere notice of alleged wrongdoing is insufficient to establish a supervisor's or administrator'[s] personal involvement. *Gibson v. Comm'r of Mental Health*, No. 04 Civ. 4350, 2008 WL 4276208, at *8, 2008 U.S. Dist. LEXIS 70080, at *27 (S.D.N.Y. Sept. 17, 2008). While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . '[p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.'" *Boddie v. Morgenthau*, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (quoting *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002).

## B.     Application

In this case, defendant Bellinier is the Superintendent of Upstate. Plaintiff claims that defendant is bringing this action against defendant Bellinier because he failed to "properly act upon plaintiff's complaints." (COA ¶ 1). Plaintiff states that he wrote "scores" of grievances and "formal" complaints, some of which were apparently sent to defendant Bellinier. Plaintiff states that he complained about his "concerns" about being double celled because he was threatened in *2002* while he was at the Elmira Reception Center. Plaintiff also complained about being housed with younger inmates and inmates who had a longer sentence that he did.[8] There is absolutely no

---

[8] To the extent that plaintiff alleges that he was housed with young inmates or inmates who had longer sentences than he did in violation of a state or department policy, such a violation would not state a constitutional claim. The violation of a state law or department directive, without more, does not rise to the level of a constitutional violation. *See, e.g., Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). Plaintiff also cites no

indication that defendant Bellinier was personally involved in determining any of the complaints or grievances that plaintiff filed, and to the extent that he did not answer plaintiff's letters, the allegation does not rise to the level of personal involvement. Even assuming that plaintiff filed formal grievances, the Superintendent is not automatically personally involved in the appeal of every grievance.

Most importantly, although plaintiff states that he complained about being housed in a "double cell," there is no indication that he complained about his specific cell-mate. There is also no claim that defendant Bellinier was aware of the specific inmate with whom plaintiff allegedly had the "altercation." Thus, the complaint may be dismissed as against defendant Bellinier at this time for lack of personal involvement.

## VI. <u>Failure to Protect</u>

### A. **Legal Standard**

An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain.'" *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir. 1991)(citation omitted). An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of other inmates states a claim under section 1983. *Id.* at 113.

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk

---

harm that resulted to him from being housed with these "other" inmates.

and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.*

### B.     Application

As stated above, plaintiff claimed that he was threatened in 2002 while in the Elmira Reception Center, and it was this experience that caused him to be concerned for his safety. Plaintiff states that he wrote letters and complained from November of 2007 until April of 2008, at least five or more years after the alleged threat occurred. It would be difficult to draw an inference that plaintiff was in excessive danger in 2008, based upon a threat at the reception center in 2002. As stated above, assuming that plaintiff did complain generally about being housed in a double cell, this complaint is not specific to the inmate with which he was housed at the time of the April 10, 2008 incident. Plaintiff states that he also complained about being housed with inmates who were too young or had sentences that were longer than his. These latter complaints had nothing to do with threats or gang membership. There is no indication that any of the defendants were aware of a *danger* to plaintiff *prior to* April 10, 2008, the date of the incident.

On April 10, 2008, plaintiff claims that he "implored" the housing unit officers to remove him from his double cell because of statements addressed to plaintiff by his cell-mate. It is unclear when the "statements" were made, but it appears that they may

have been made on the same day. Plaintiff states that he spoke with defendants McDonald and Patterson and requested to be removed from the cell. Plaintiff does not claim that either of these defendants would have been aware of any problem with this inmate prior to that date. Thus, neither defendant would have been aware of and disregarded a substantial risk to plaintiff. Nor does plaintiff allege that either defendant McDonald or defendant Patterson would have had the authority to move plaintiff the same day.

Plaintiff states that when his request to be moved was denied on April 10, 2008, and he was not allowed to speak with a supervisor, he refused to comply with the officers' request to return his "feed up tray." Additionally, although plaintiff claims that he and his cell-mate had a "physical conflict," plaintiff states that the "conflict" ended in plaintiff tying up his cell-mate with torn linens to "prevent him from perpetuating any further physical aggression." (Compl. ¶ 6). Plaintiff was not injured or harmed, and he appears to have been able to protect himself.[9] In fact, it appears that plaintiff retained the feed-up tray to "protect himself" against his cell-mate. In the relief section of his complaint, plaintiff states that although *his* actions appeared "rather suspect (i.e. him holding the feed up tray & conflicting his cell mate)," the court should hold defendants responsible for failure to protect.

Plaintiff alleges that defendant McDonald should be liable for "verbally exposing" the nature of plaintiff's conviction to the inmates in his housing unit for the

---

[9] This court in no way condones the cell-mate's behavior, rather, the court points out that plaintiff cites to no injury that he suffered from his cell-mate's alleged aggression.

13

purpose of causing him "harm," however, no harm came to plaintiff from defendant McDonald's alleged comments. Plaintiff never explains how defendant McDonald's statements would have put plaintiff in danger. Without any type of injury, plaintiff's failure to protect claim may be dismissed. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 382-83 (S.D.N.Y. 2011) (citing *inter alia Encarnacion v. Dann*, 80 F. App'x 140, 141-42 (2d Cir. 2003) (court granted summary judgment for defendants when plaintiff suffered no actual injury from the defendants' alleged failure to protect, and any injury suffered by plaintiff stemmed from his own affirmative action); *Cruz v. Hillman*, No. 01 Civ. 4169, 2002 WL 31045864, at *8 (S.D.N.Y. May 16, 2002) (granting motion to dismiss when plaintiff suffered only "much mental anguish . . . worry and grief," and court stated that fear of assault was insufficient to support an Eighth Amendment claim)). Thus, plaintiff's claims of failure to protect may be dismissed as against all defendants.

## VII. **Excessive Force**

### A. **Legal Standard**

The Eighth Amendment prohibits the "'unnecessary and wanton infliction of pain.'" *Baker v. Willett*, 42 F. Supp. 2d 192, 196 (N.D.N.Y. 1999) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). When the use of excessive force is alleged, the court must determine whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitely v. Albers*, 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*,

414 U.S. 1033 (1973)). In order to meet the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.'" *Whitely*, 475 U.S. at 327.

Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992). However, the court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely*, 475 U.S. at 321. Not every push or shove, even if it seems unnecessary, amounts to a violation of the constitution. *Hudson*, 503 U.S. at 9–10 (*de minimis* force); *Johnson v. Glick*, 481 F.2d at 1033.

In this case, plaintiff alleges that after the April 10, 2008 incident with his cell-mate, plaintiff refused to return his feed-up tray and would not come out of his cell. Plaintiff states that an "extraction team was called." Plaintiff claims that defendant Patterson was part of the extraction team, and during the extraction, defendant Patterson hit plaintiff on the head several times and tore out a patch of his hair after plaintiff had been placed in restraints and was complying with orders. Plaintiff states that, as a result, he suffered a great deal of pain and had to shave the rest of his head due to the missing patch of hair. (Compl. ¶ 8).

The loss of a patch of hair does not seem to be a significant injury, however, while a *de minimis* use of force will "rarely suffice to state a constitutional claim, a

15

plaintiff is not required to show that the application of force resulted in any serious injury." *Porter v. Goord*, No. 04-CV-485, 2009 WL 2180580, at *10 (W.D.N.Y. July 22, 2009) (citing *Hudson*, 503 U.S. at 9-10).  Because this is a motion to dismiss, the court must accept plaintiff's allegations as true.  If defendant Patterson did strike plaintiff on the head and tear out a patch of his hair after plaintiff had already been restrained and was complying with the guards' orders, plaintiff would state a plausible Eighth Amendment claim.  Therefore, the court will not recommend dismissal of plaintiff's excessive force claim as against defendant Patterson.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 10) be **DENIED IN PART** with respect to plaintiff's excessive force claim as to **DEFENDANT PATTERSON IN HIS INDIVIDUAL CAPACITY ONLY**, and it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 10) be **GRANTED IN PART**, and the complaint **DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE AS TO ALL CLAIMS AGAINST DEFENDANTS BELLINIER AND McDONALD** and it is further

**RECOMMENDED**, that the defendants' motion to dismiss (Dkt. No. 10) be **GRANTED IN PART**, and the complaint be dismissed in its entirety **WITH PREJUDICE** insofar as it asserts official capacity claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO**

16

**THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 6, 2012

_____
Hon. Andrew T. Baxter
U.S. Magistrate Judge